COMMONWEALTH *vs.* RICHARD KENDALL.

Suffolk.     September 11, 1979. — February 12, 1980.

Present: GRANT, BROWN, & DREBEN, JJ.

*Insanity. Witness,* Expert. *Evidence,* Hearsay, Expert opinion. *Practice, Criminal,* Psychiatric examination, Argument by prosecutor.

Hearsay was not admissible in the course of the testimony-in-chief of a psychiatrist testifying at a criminal trial as a rebuttal witness for the Commonwealth, notwithstanding the fact that he had properly relied on hearsay as part of the basis for his professional opinion. [157-158]

At a criminal trial the judge did not abuse his discretion by excluding proffered testimony of a third psychiatrist, intended to bolster the professional credibility of the defendant's psychiatrist which had been impeached by testimony of the Commonwealth's psychiatrist. [158-159]

At a criminal trial it was error to exclude a psychiatrist's testimony tending to substantiate the legitimacy of medical treatment the defendant was allegedly receiving from a different psychiatrist who had testified in support of the defendant's claim of insanity. [159-160]

At a criminal trial where the issue was the defendant's claim of insanity, no error appeared in the judge's admitting testimony from the Commonwealth's expert that the defendant had refused to speak to him, followed immediately by an instruction to the jury that they should draw no inferences against the defendant from his exercise of the right to remain silent. [160]

Discussion of improprieties in the closing argument by a prosecutor, including mistatements of the law and the evidence and personal invective against the defendant's psychiatrist, which were to be avoided at the retrial of a case in which the defendant had interposed a claim of insanity. [160-162]

INDICTMENTS found and returned in the Superior Court on May 4, 1976.

The cases were tried before *Tamburello, J.*

*Hugh W. Samson* for the defendant.

*Stephen M. Needle,* Assistant District Attorney, for the Commonwealth.

BROWN, J. The defendant appeals under the provisions of G. L. c. 278, §§ 33A-33G, from his convictions on indictments charging rape, robbery, and breaking and entering with intent to rape.

At trial, the defendant interposed the claim of insanity at the time of the incidents, and produced expert psychiatric witnesses who gave their opinions supporting his claim. The Commonwealth produced its own psychiatric witness, who disputed this claim.

The defendant raises the following issues in this appeal: (1) whether the judge erred in allowing the Commonwealth's psychiatric expert to testify to hearsay allegations by the victim and by the defendant's wife which were incompetent as substantive evidence, under the guise that they formed part of the basis of his opinion that the defendant was criminally responsible; (2) whether the judge erred in not allowing one of the defendant's psychiatric experts to explain an accepted mode of treating paranoid schizophrenia so as to bolster the professional credibility of the defendant's treating psychiatrist and primary expert witness, who had been impeached by the Commonwealth with respect to the

mode of his treatment as well as other matters; (3) whether the judge erred in allowing the Commonwealth's psychiatrist to testify that the defendant refused to submit to a court-ordered criminal responsibility examination; and (4) whether the prosecutor's closing argument was improper. We conclude that there was error and therefore reverse the convictions.

We summarize the evidence presented at the trial. In its case in chief, the Commonwealth called the victim as its first witness. She testified as to the rape and the manner in which it had been committed, the details of which were not disputed. The Commonwealth also called a friend of the victim and three detectives who had participated in the investigation of the case and in the defendant's arrest. The testimony elicited from these latter sources did not address squarely the insanity issue raised by the defendant.

The defendant called his wife, Evelyn Kendall, and his father, William Kendall, who related incidents from the defendant's childhood and marriage that suggested a history of emotional problems. In addition, the defendant called and relied in great part on the expert testimony of Dr. Smith,[1] who for eight years prior to the incident had treated the defendant, and a Dr. Jiminez, who had examined the defendant after the incident.[2]

Dr. Jiminez was called in an effort to rehabilitate Dr. Smith. Defense counsel sought to elicit from Dr. Jiminez, inter alia, an expert opinion substantiating the scientific credibility and advisability of employing the method of treating the defendant which Dr. Smith had employed.[3] This testimony was excluded.

---

[1] Due to extensive hearsay allegations presented at trial which were damaging to this psychiatrist's professional integrity, we choose to employ a pseudonym for him throughout the opinion.

[2] Both Dr. Smith and Dr. Jiminez were qualified as expert witnesses.

[3] It was manifest from all sources that Dr. Smith spent time with the defendant outside his office establishing a pesonal relationship with him, that he bought the defendant gifts, on occasion gave him money, and helped him find a place to live. This information was presented at times

In addition to vigorously and effectively cross-examining Dr. Smith, the Commonwealth renewed its case by calling, in rebuttal, a psychologist who had worked with the defendant for nine months while he was a patient at Boston State Hospital in 1974; a social worker who had had contact with the defendant while he was held at Bridgewater State Hospital (Bridgewater) from August of 1976 to the trial date; and a psychiatrist at Bridgewater, Dr. Cronin, who had attempted unsuccessfully to interview and perform a criminal responsibility examination on the defendant[4] but who had interviewed the victim, the arresting officers and the defendant's wife. Dr. Cronin also reviewed the grand jury minutes, the transcript of the competency hearing of August 25 and 26, 1976, and the defendant's medical records. Furthermore, Dr. Cronin was present throughout the trial and thus had the opportunity to listen to the testimony of the various witnesses and observe the defendant for eight days. These three witnesses gave opinions adverse to the defendant's claim of insanity.

Dr. Cronin, however, provided testimony which proved to be the centerpiece of the Commonwealth's case and which raises the primary issue in this appeal. Because he was unable to speak with the defendant his testimony was, perforce, limited by that which he had ascertained from the sources enumerated above. Rather than responding to hypothetical questions which incorporated this information (to the extent it was elicited at trial), or summarizing rele-

---

in a light that was damaging to Dr. Smith's professional credibility and suggested unusual psychiatric techniques. Once Dr. Smith was impeached, defense counsel argued that he had a right to show through another expert witness that Dr. Smith's method of treatment was, if "unusual," accepted by some members of the profession as an alternative means of treating a mental disorder which has admitted of no standard or "accepted" cure.

[4] Dr. Cronin was ordered by the court to perform a criminal responsibility examination on the defendant, and on August 2, 1976, met with the defendant at Bridgewater for that purpose. Dr. Cronin gave the defendant the *Lamb* warnings, see *Commonwealth* v. *Lamb,* 365 Mass. 265 (1974), and on advice of counsel the defendant refused to participate.

vant portions of such information so as to construct a foun-
dation for his ultimate expert opinion, Dr. Cronin's testi-
mony consisted in large part of his repeating at great length
factual allegations he reportedly had learned in the course
of interviews he had had with the victim and the defend-
ant's wife. Most of this information was not testified to by
those witnesses[5] in court.[6]

Dr. Cronin testified at great length, often times engaging
in extended narrative responses, to questions regarding in-
formation that he reportedly had learned from the defend-
ant's wife during an interview that lasted between one and
one-half and two hours. Dr. Cronin testified that the de-
fendant's wife had told him, inter alia, that the defendant's
relationship with Dr. Smith was "bizarre and unprofession-
al"; that Dr. Smith had perverted sexual attitudes; that the
defendant had been arrested "at least fifty times" for serious
crimes but that each time Dr. Smith secured his release
before a record of the arrest was made by concocting false
insanity defenses; that in her opinion the defendant never
suffered from psychotic delusions, and that the defendant
threatened to murder her if she ever "turned on him" and
that he would make it look like suicide, which Dr. Smith
would substantiate in the death certificate.[7]

[5] It is to be noted at this point that the Commonwealth had attempted
to elicit this information from Mrs. Kendall and that it had been excluded
as hearsay.

[6] For the purposes of this opinion it is necessary only to summarize
Dr. Cronin's testimony with respect to information he had reportedly
learned from Mrs. Kendall. We believe that his testimony relating in-
formation reportedly elicited from the victim was, in large part, cumula-
tive of that which she had testified to on the stand, which Dr. Cronin
heard, and which, for the purposes of a new trial, will be covered by prin-
ciples enunciated *infra*.

[7] The defendant's wife did testify, on cross-examination by the Com-
monwealth, as to some incidents which allegedly took place between the
defendant and Dr. Smith and which, if believed, could be interpreted as
suggesting an unusual psychotherapist-patient relationship. It should be
noted, however, that Dr. Cronin's testimony summarized in the text,
*supra,* went immeasurably beyond the wife's testimony.

The Commonwealth offered this testimony, over the defendant's objection and exception, under an exception to the hearsay rule, as being probative of the defendant's state of mind, "at about the time of the . . . rape." The judge allowed it, however, not on the basis that it should be credited for the truth of the matter asserted, but as showing the basis of Dr. Cronin's expert opinion, and so instructed the jury.

1. *The Basis of an Expert's Opinion.*

The defendant's principal claim of error is that the testimony of the Commonwealth's psychiatrist, Dr. Cronin, contained inadmissible, prejudicial hearsay. See *Commonwealth* v. *Harrison*, 342 Mass. 279, 287-288 (1961). It is well settled that while an expert witness may consider hearsay as the basis for his opinion,[8] this does not make the hearsay itself admissible. Put another way, an expert "may not, under the guise of stating the reasons for his opinion, testify to matters in the course of his direct examination unless such matters are admissible under some statutory or other recognized exception to the hearsay rule." *Kelly Realty Co.* v. *Commonwealth*, 3 Mass. App. Ct. 54, 55-56 (1975), and cases cited. See *Commonwealth* v. *O'Connor*, 7 Mass. App. Ct. 314, 319 (1979). See also *Commonwealth* v. *Tucker*, 189 Mass. 457, 479 (1905) (expert witness cannot fortify his opinion by putting in evidence incompetent facts). Were it otherwise, an expert would not merely aid the jury in their understanding of the facts, he would indulge in supplying the facts. This would not only raise all the familiar problems of testing credibility that hearsay presents, it would further tend to enhance the credibility of the underlying facts adduced by giving them the gloss of an expert's apparent acceptance. See Leach & Liacos, Massachusetts Evidence 100-101 (4th ed. 1967).

---

[8] See in this regard, *United States* v. *Sims*, 514 F.2d 147, 149-150 (9th Cir.), cert. denied, 423 U.S. 845 (1975), and McCormick, Evidence § 15 (2d ed. 1972).

For these reasons, it was error to admit a great part of Dr. Cronin's testimony, as outlined above. Contrast Fed.R. Evid. 703. Dr. Cronin's in-court recitation of what Mrs. Kendall told him out-of-court rested for its value upon the credibility of Mrs. Kendall. It was therefore inadmissible hearsay.[9] Cf. *Commonwealth* v. *Bladsa,* 362 Mass. 539, 540-541 (1972).

Furthermore, the judge's error in admitting the incompetent allegations was exacerbated by the fact that the statements primarily concerned Dr. Smith's competence and were obviously irrelevant to Dr. Cronin's opinion of the defendant's sanity. The allegations that Dr. Smith entertained a bizarre and unprofessional relationship with the defendant, that Dr. Smith had perverse sexual attitudes, and that Dr. Smith had concocted false insanity defenses at least fifty times,[10] shed no light on the defendant's mental condition when he committed the specific offenses. The introduction of these allegations through Dr. Cronin permitted the Commonwealth to damage the defense by discrediting Dr. Smith with hearsay evidence that was incompetent and unreliable. A defendant's psychiatrist should not be put on trial, nor should a trial be allowed to become merely a war between the experts. See *Commonwealth* v. *Russ,* 232 Mass. 58, 80 (1919). Cf. *Olson* v. *Ela,* 8 Mass. App. Ct. 165, 169-170 (1979).

2. *Rehabilitation of Dr. Smith.*

The defendant argues that once Dr. Smith was impeached, he ought to have been allowed to rehabilitate his expert through the testimony of another expert, Dr. Jiminez. See 4 Wigmore, Evidence § 1100, at 232 (Chadbourn rev. 1972). However, the reliability of expert testimony cannot be made the subject of other expert testimony. *Common-*

---

[9] It would be fair to say that much of what Mrs. Kendall reportedly told Dr. Cronin concerning Dr. Smith's conduct and treatment of the defendant was double hearsay. It was not something observed by Mrs. Kendall, but something that she learned from a third person and then repeated to Dr. Cronin.

[10] On the record, the defendant had been arrested sixteen times.

*wealth* v. *Russ, supra.* See *Commonwealth* v. *Millen,* 289
Mass. 441, 482-483 (1935). See also *Olson* v. *Ela, supra* (no
witness can comment on the credibility of another witness).
This limitation upon the scope of expert opinion testimony is
based on the fundamental proposition that the weighing of
evidence and the credibility of witnesses is for the jury. It
thus was not error to exclude expert testimony bolstering the
professional credibility of Dr. Smith.[11]

Additionally, the defendant contends that apart from re-
habilitating Dr. Smith, he had a constitutional right to put
in further evidence to explain the method of Dr. Smith's
psychiatric treatment to avoid adverse inferences about it,
even if the evidence was otherwise inadmissible. Compare
*Commonwealth* v. *Williams,* 244 Mass. 515, 520 (1923).
While Dr. Jiminez was explaining certain methods for treat-
ing paranoid schizophrenia, the judge sustained the Com-
monwealth's objection on the ground that the question
called for speculation as to what some psychiatrists think
and do. This ruling was error. "Attacks on [the] validity
[of an expert's opinion] are open to the defendant . . .
through his own witnesses." *Commonwealth* v. *Boyd,* 367
Mass. 169, 181 (1975), and authorities cited. The defend-
ant should have been given an opportunity to put evidence
before the jury tending to support the legitimacy of the
medical treatment he was allegedly receiving.[12] See *Com-
monwealth* v. *Lundin,* 326 Mass. 551, 557-558 (1950). Cf.
*Commonwealth* v. *Rodriguez,* 378 Mass. 296, 308 (1979).
Moreover, this evidence was essential to the defendant's in-

---

[11] It should be noted, however, that the admission or exclusion of testi-
mony from an expert witness which *may be* supportive or disparaging of
that given by another expert is within the sound discretion of the trial
judge, so long as the testimony is otherwise admissible.

[12] It may be noted that an expert may inferentially disparage the con-
trary opinions of other witnesses, by stating that the best way to discover
the facts upon which to base an opinion in the matter is the method used
by him, and not by the method used by the other witnesses. In other
words, the strength or weakness of the *methods* respectively used, as op-
posed to the *conclusions* reached, may be a proper subject of expert opin-
ion. See Hughes, Massachusetts Evidence § 326, at 406-407 (1961).

sanity claim, coming as it did immediately after his principal expert witness had been impeached. Cf. *Commonwealth* v. *Fatalo*, 345 Mass. 85, 88 (1962).

3. *Dr. Cronin's Testimony Regarding the Defendant's Refusal to Submit to a Court-ordered Examination.*

Dr. Cronin was allowed to testify solely to the fact that the defendant had refused to speak with him and was not allowed to testify to any further conversation between himself and the defendant. The judge immediately instructed the jury that the defendant possessed the privilege of refusing to speak with Dr. Cronin and that they should draw no adverse inference from his having exercised his privilege. The judge's ruling, although earlier in time, is in accordance with the holding in *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 769 (1977), and with G. L. c. 233, § 20B(*b*). There was no error.

4. *The Prosecutor's Closing Argument.*

We touch upon this point so as to insure that the new trial is free from problems in this area which might unnecessarily precipitate further appellate review.

During closing argument the prosecutor argued, inter alia, that Mrs. Kendall had testified that the defendant had committed more than fifty crimes for which he had not been arrested or convicted because on each occasion Dr. Smith had secured the defendant's release by concocting false insanity defenses. In fact, Mrs. Kendall did not so testify about the various crimes the defendant had allegedly committed. See S.J.C. Rule 3:22A, PF 13(a), 377 Mass. 927 (effective March 1, 1979). Compare *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 420-421 (1978). The only testimony concerning these allegations came from Dr. Cronin, who told the jury that Mrs. Kendall had made these allegations to him in an out-of-court interview. This testimony was admitted pursuant to the judge's limiting instruction that it was admissible only as the basis for Dr. Cronin's expert opinion and not for the truth of the matters asserted. Accusing the defendant of fifty prior crimes with no proper foundation in the evidence was error. See note 10, *supra*.

Accusing Dr. Smith of concocting fifty insanity defenses was equally so. *Commonwealth* v. *Shelley,* 374 Mass. 466, 469-470 (1978). See *Commonwealth* v. *Redmond,* 370 Mass. 591, 594, 597 (1976); *Commonwealth* v. *Ryan,* 8 Mass. App. Ct. 941 (1979). These allegations may well have diverted the jury's attention from deciding the central issue — whether the defendant was criminally responsible for the alleged crimes — to weighing the credibility of the defendant's primary expert witness through a haze of highly prejudicial remarks.

Furthermore, the prosecutor subsequently used these allegations to imply that if the jury found the defendant not guilty by reason of insanity, he would be back on the street. This was a misstatement of the law and was also improper. *Commonwealth* v. *Killelea,* 370 Mass. 638, 646 (1976).

The prosecutor also argued that Mrs. Kendall had experienced delusions and hallucinations in the past and was therefore competent to recognize these symptoms but had never observed the defendant suffering from them. This argument again went beyond the evidence, as Mrs. Kendall had not testified concerning whether she or the defendant had suffered from delusions or hallucinations. Furthermore, the prosecutor's suggestion that Mrs. Kendall was competent to gauge such behavior in the defendant was improper, as she had not been qualified as an expert witness by the trial judge. See *Commonwealth* v. *Fitzgerald, supra* at 416-418, 420-423.

These remarks and others which sought to portray Dr. Smith as a corrupt person whose testimony should not be believed must be avoided upon retrial. The Commonwealth is cautioned to keep to the evidence in its closing argument and to avoid introducing personal invective against the defendant's psychiatrist.[13] See *Commonwealth* v. *Shelley, su-*

---

[13] The Commonwealth concedes that the prosecutor's comment regarding Dr. Smith's demeanor while testifying (i.e., "laughing like a paranoid schizophrenic") was improper.

*pra.* See also *Commonwealth* v. *Cepulonis,* 7 Mass. App.
Ct. 646, 650 (1979); *Commonwealth* v. *Jones, ante* 103,
119-120 (1980).

*Judgments reversed.*

*Verdicts set aside.*